UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                HON. MARK A. GOLDSMITH

v.                                           Case No. 12-CR-20287

ALEXANDRA NORWOOD, et al.

                Defendants.
_____/

## OPINION AND ORDER DENYING DEFENDANT JONATHAN WALKER'S MOTION TO DISMISS COUNT THREE BASED ON DOUBLE JEOPARDY (DKT. 235)

### I. INTRODUCTION

The motion before the Court concerns whether the federal, state, and local governments are so interrelated in this case as to be treated as one sovereign for purposes of double jeopardy.[1] Defendant Jonathan Walker pled nolo contendere to manslaughter in Genesee County Circuit Court in 2009, arising from charges related to the death of Marion Hardy. Hardy's death now forms the basis for Count Three of the Government's superseding indictment: Murder in Aid of Racketeering.

---

[1] This motion is joined by Defendants Jatimothy Walker (Dkt. 240), Declyde Brewton (Dkt. 241), and Carvell Gordon (Dkt. 257).

Defendant Sean Cunningham also filed a motion to dismiss based on double jeopardy (Dkt. 239). Defendant Cunningham's motion incorporated Defendant Walker's arguments (Dkt. 235), but was filed separately to add facts specific to Defendant Cunningham. However, because Defendant Cunningham subsequently pled guilty (Dkt. 314), his motion to dismiss is denied as moot.

Defendant Cunningham's motion also was joined by Defendants Brewton (Dkt. 241) and Gordon (Dkt. 259). The Court denies Defendant Cunningham's motion as moot as to these Defendants as well, given that they also joined in Defendant Walker's motion, and Defendant Cunningham's motion added no substantive legal argument to that motion. Even if the motion was not moot as to all three Defendants, however, the Court still would deny Defendant Cunningham's motion for the reasons set forth in this decision.

Defendant claims that this count is a "sham, successive prosecution" of the earlier manslaughter conviction. Def.'s Mot. at 2 (Dkt. 235). In particular, Defendant points to the alleged use of a joint governmental task force, which he claims suggests that Count Three is nothing more than a second effort by two sovereigns acting as one to convict him for murder. Id. Defendant claims that this violates the Double Jeopardy Clause of the Fifth Amendment, and thus dismissal is required. Id. at 3.

The Government filed a response (Dkt. 283), and the Court heard oral argument on October 16, 2013. For the reasons set forth below, the Court denies Defendant's motion.

## II. BACKGROUND

Defendant was arrested and charged with first degree/felony murder and felony firearm in state court relating to the 2006 death of Marion Hardy. Def.'s Br. at 1. Defendant accepted a plea agreement in March 2009; he pled nolo contendere to the reduced charge of voluntary manslaughter. Defendant contends his sentence included no more jail time, credit for the time served in detention, and immediate release on a term of supervised probation. Id.

A federal grand jury subsequently returned an indictment against Defendant Walker and other alleged members of the purported Howard Boys gang in May 2012. Defendant Walker is charged with a number of counts, including, as pertinent to this motion, Murder in Aid of Racketeering (Count Three). This charge is based on the alleged homicide of Marion Hardy, which is listed as Overt Act ¶ 35 of the governing indictment. Am. First Superseding Indictment at 11, 23 (Dkt. 191). Defendant claims that this Count is a second attempt at prosecution for murder by a joint governmental task force — composed of federal and local law enforcement — that allegedly existed at the time of Marion Hardy's death. Def.'s Br. at 2.

2

## III.  DISCUSSION

The Double Jeopardy Clause, contained in the Fifth Amendment to the United States Constitution, provides that no person shall "be subject for the same offen[s]e to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  It is well settled, however, that the Double Jeopardy Clause does not prevent different sovereigns from separately prosecuting the same individual, "even if both are criminal suits for the same offense."  United States v. Louisville Edible Oil Prods., Inc., 926 F.2d 584, 587 (6th Cir. 1991) (internal citations omitted).  Under the "dual sovereignty doctrine," the Constitution permits "consecutive federal and state prosecutions and convictions of defendants for crimes arising from the same transaction."  See United States v. McDonald, 96 F.3d 1448 (Table), 1996 WL 506517, at *1 (6th Cir. Sept. 5, 1996) (citing Abbate v. United States, 359 U.S. 187, 196 (1959)).  Nevertheless, the Supreme Court suggested a very limited exception to the dual sovereignty doctrine in Bartkus v. Illinois, 359 U.S. 121 (1959), in the context of finding that a state prosecution for the same crime upon which the defendant had been acquitted in federal court was constitutional.  In dicta, the Court noted that

> [the record] does not support the claim that the State of Illinois in bringing its prosecution was merely a tool of the federal authorities, who thereby avoided the prohibition of the Fifth Amendment against a retrial of a federal prosecution after an acquittal.  It does not sustain a conclusion that the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution.

Id. at 123-124.  The suggestion that such a showing may have warranted double jeopardy protection has come to be known as the "Bartkus exception."

Some courts, including the Sixth Circuit, have questioned whether the Supreme Court intended to create such an exception.  United States v. Djoumessi, 538 F.3d 547, 550 (6th Cir. 2008); see also United States v. Guzman, 85 F.3d 823, 826-827 (1st Cir. 1996) (collecting cases).

Nevertheless, to the extent the exception exists, it is a "narrow one." Djoumessi, 538 F.3d at 550. Indeed, the Sixth Circuit noted in 2008 — nearly fifty years after Bartkus was decided — that, "so far as this circuit is concerned, it is an exception that has yet to affect the outcome of a single case." Id.

For the exception to apply, one sovereign must have been a "tool" of, or a "sham and a cover" for, the other sovereign's prosecution. United States v. Carr, 78 F.3d 585 (Table), 1996 WL 99318, at *3 (6th Cir. Mar. 6, 1996). This is a very high standard; it has been described as requiring a situation in which "one sovereign so thoroughly dominates or manipulates the prosecutorial machinery of another that the latter retains little or no volition in its own proceedings." Guzman, 85 F.3d at 827 (internal citations omitted); see also Djoumessi, 538 F.3d at 550 ("[Defendant] has not made the startling showing that the Federal Government was 'merely a tool' of the State of Michigan in undertaking this prosecution, somehow ceding its sovereign authority to prosecute and acting only because the State told it to do so.").

Defendant Walker argues that the use of a joint task force composed of federal and local agents requires that double jeopardy attach under the Bartkus exception. He highlights that the charges against him in Count Three (Murder in Aid of Racketeering) arise out of the same homicide for which Defendant previously pled nolo contendere to manslaughter in state court. See Def.'s Mot. at 2 (Dkt. 235). He also asserts that the federal charge likely will use the same evidence and witnesses, and that it "appears suspiciously as a second effort on the part of the same task force, a joint governmental operation involving the prosecuting arm of . . . two sovereigns working as one, to take Jonathan Walker to trial on a charge of Murder." Id.

As evidence of this asserted collusion, Defendant points to two items. First, he emphasizes discovery he received supposedly revealing a joint governmental interview of one

4

Defendant in this case, Alexandra Norwood, nearly two years before the death of Marion Hardy. He claims this suggests that the task force existed prior to the state charges against him. Def.'s Br. at 2.[2] Second, Defendant notes that an unindicted co-conspirator was allowed to plead nolo contendere to voluntary manslaughter — the same plea Defendant was offered in regards to Marion Hardy — for an unrelated October 2010 arrest for murder also involving Defendant.[3] Id. Defendant asserts this suggests that "collaborative[] and strategic decisions [are] being made collectively" by the local, state, and federal authorities. Id. Accordingly, Defendant claims he is entitled to double jeopardy protection, requiring dismissal of Count Three.

The Government responds that cooperation between different sovereigns, including with respect to the timing of prosecutions, does not constitute a "sham" prosecution warranting treating the sovereigns as one. Gov't Resp. at 7-8 (Dkt. 283). In essence, the Government contends that the Bartkus exception, to the extent it exists, only applies where one sovereign has ceded its sovereign authority to prosecute to the other sovereign, i.e., only prosecuting and acting in such a manner as instructed to do so. The Government argues that there is no such evidence of control in this case. Rather, the Government claims that the level of cooperation alleged by

---

[2] It is unclear whether Defendant continues to rely on this discovery in suggesting that the task force existed prior to Marion Hardy's death. Defense counsel conceded at oral argument that the interview was conducted solely by local police, and not by both local and federal law enforcement, as he originally thought. Indeed, the Government contends that the investigation into the Howard Boys did not begin until August 2009. Gov't Resp. at 6-7 n.1 (Dkt. 283).

[3] In October 2010, approximately 18 months after his sentencing for Marion Hardy's death, Defendant and an unindicted co-conspirator were arrested and firearms were found in the trunk of Defendant's car. Def.'s Br. at 2. The arrest was generated by an investigation into a homicide that occurred earlier in the day. Id. Both parties were charged with felony firearm and first degree murder arising out of that homicide. The state's case against Defendant was dismissed and a felon-in-possession of firearm indictment in federal court was brought against Defendant. Id. Defendant also alleges that the state's murder and felony firearm charges against the unindicted co-conspirator were dismissed and he was allowed to plead nolo contendere to voluntary manslaughter close to two years after his arrest. Id.

Defendant here has been described as an "admirable use of resources" by the Sixth Circuit. Gov't Resp. at 5-8 (citing United States v. Mardis, 600 F.3d 693, 697 (6th Cir. 2010)).

Defendant has cited no authority — in the Sixth Circuit or otherwise — where the Bartkus exception influenced the outcome of a case. See Djoumessi, 538 F.3d at 550. The Court's own research similarly revealed very few cases where the court suggested a "sham" prosecution, rather than mere cooperation. Moreover, in those rare instances where a court found a possible Bartkus issue, the sovereigns were significantly more entangled than Defendant alleges here. See, e.g., United States v. Bernhardt, 831 F.2d 181 (9th Cir. 1987); see also United States v. All Assets of G.P.S. Automotive Corp., 66 F.3d 483 (2d Cir. 1995); United States v. Belcher, 762 F. Supp. 666, 670-671 (W.D. Va. 1991).

For example, in Bernhardt, 831 F. 2d at 181, the defendants obtained a dismissal in state court based on the applicable statute of limitations. Shortly before the dismissal, the Special State of Hawaii Deputy Attorney General for the case, Stephen Mayo, contacted the United States Attorney for the District of Hawaii to express concern about the pending dismissal; the United States Attorney for the District of Hawaii had not previously conducted an investigation into the matter. Id. at 181-182. The United States Attorney agreed to undertake prosecution of defendants for the same conduct, provided (1) that Mr. Mayo became the lead attorney for the federal case (he subsequently became a "Special Assistant U.S. Attorney") and (2) that the state would pay his salary. Id. The district court concluded that these circumstances warranted application of the Bartkus exception. Id. at 181.

In a decision that emphasizes the narrowness of the exception, however, the Ninth Circuit reversed the district court's determination and remanded for further fact finding. While the Ninth Circuit agreed that the circumstances were "troubling," the court explained that "the

6

federal government always has the right to decide that a state prosecution has not vindicated a violation of federal law. Such a decision is necessarily made only after the state prosecution has ended. Simultaneous prosecutions are duplicative and expensive and should be avoided as a matter of policy." Id. at 183 (internal quotation marks and citations omitted). The court also noted that while Mr. Mayo may have been the lead attorney on the federal case, the record suggested that several Assistant U.S. Attorneys may have worked on the prosecutions, and that "sufficient independent federal involvement would save the prosecutions from [the Bartkus] exception." Id. Accordingly, the Ninth Circuit remanded to the district court for further findings regarding whether there was sufficient independent federal involvement.

Similarly, the possible entanglement in All Assets of G.P.S. Automotive Corp., 66 F.3d at 496, further exemplifies the narrowness of the Bartkus exception. In that in rem forfeiture action, the defendants argued the exception should apply because the "Suffolk County District Attorney's Office referred th[e] case to the U.S. Attorney in the first instance, that much of the evidence used in the federal forfeiture action was developed in connection with their state criminal proceedings, and that a Suffolk County district attorney was cross-designated as a Special Assistant U.S. Attorney for the purpose of prosecuting the federal forfeiture action." 66 F.3d at 495-496. The Second Circuit found no issue with those concerns to the extent the conduct only constituted cooperation between the sovereigns. However, the court did note that

> [i]t was alleged in this case and further developed at oral argument that the state will ultimately receive a very large percentage of whatever forfeiture proceeds are derived from the federal action. If a state prosecutes to conviction and then prevails upon the federal prosecutor to deputize a state district attorney to bring a forfeiture, ostensibly in the name of the United States, but for the sole benefit of the state, the principles behind the Bartkus exception would be strongly implicated. In such a case, the federal government would have no interest in the forfeiture proceeding, and would be serving simply as a "tool" for the advancement of the state's interest.

7

Id. at 495-496. Therefore, the court remanded for the district court to consider, in combination with the other factors, whether the Government had its own interest in the proceeds from the forfeiture or whether the state "may receive nearly all, or a disproportionate share, of the forfeiture proceeds." Id. at 496.

Belcher, 762 F. Supp. at 670-671, provides one last example of the level of entanglement required to even raise a possible Bartkus concern. In that case, like in Bernhardt, the state prosecutor was concerned about the likely conclusion in his state case against defendants. He therefore drafted a federal indictment against the defendants in his role as a Special Assistant United States Attorney, and he sought support from an Assistant United States Attorney for bringing the indictment by promising to "handle the prosecution." Id. at 668. In analyzing a Bartkus claim, the court noted that "it seems to the court that if the same prosecutor simultaneously derives power from both a State and the federal government, then the whole underpinning of federalism is destroyed. The fact that two sovereigns have essentially pooled their powers in one prosecutor strongly suggests to the court that in reality there are no longer two sovereigns at work." Id. at 671. The court therefore concluded that the dual sovereignty doctrine should not apply. The court added in a footnote, however, that it "does not mean to suggest that cooperation between State and federal law enforcement officials is not expected and hoped for in the ongoing battle against criminal activity in this country. . . . The case currently before the court simply indicates that State and federal functions can become so blurred and intertwined that distinctions between the two sovereigns can no longer be made." Id. at 671 n.3.[4]

---

[4] Indeed, the facts of this case have been recognized as "unique," see United States v. Ealy, No. 00-00104, 2001 WL 855894, at *1 (W.D. Va. July 30, 2001), and some courts have disagreed with its analysis. See, e.g., All Assets of G.P.S. Automotive Corp., 66 F.3d at 495 and n.10 (noting that "every circuit to consider the issue has also held that the cross-designation of a state district attorney as a federal official to assist or even to conduct a federal prosecution does not by

Here, Defendant provides no evidence suggesting that either sovereign retained little or no independent volition or decision-making in its prosecution. See United States v. Odom, 42 F.3d 1389 (Table), 1994 WL 669675, at *2 (6th Cir. Nov. 29, 1994) (a state prosecution does not bar a subsequent federal prosecution even "when state authorities referred [defendant's] case to federal authorities for prosecution as long as prosecutors are not acting as rubber stamps and exert their own discretion as to whether or not to prosecute." (internal quotation marks and citations omitted)).

Defendant's speculative contention that the use of a joint governmental task force "represents a sham, successive prosecution" is without merit. Def.'s Mot. at 2. It is well established that cooperation between the sovereigns in investigating and prosecuting claims does not raise double jeopardy concerns. See, e.g., United States v. Mardis, 600 F.3d 693, 697 (6th Cir. 2010) ("The agencies cooperated substantially in their investigations of the crimes and appear to have coordinated the timing of their prosecutions. While federal and state authorities cooperated in the investigation of Wright's disappearance, this is an admirable use of resources that the courts have found not to be problematic."). Indeed, the use of a joint governmental task force has been approved by numerous courts, including the Sixth Circuit. See, e.g., McDonald, 1996 WL 506517, at *1 ("While the effects of multijurisdictional drug task force cases on defendants' double jeopardy rights have enjoyed some place in academic literature, . . . there is no evidence that the federal courts would reconsider this time-honored policy."); see also United States v. Zone, 403 F.3d 1101, 1105 (9th Cir. 2005) (no Bartkus problem where evidence "suggests that federal and state prosecutors collaborate as equal, independent partners in the task

---

itself bring a case within the Bartkus exception," and that, in regards to Belcher, "[t]he case was not appealed . . . and no other court that we know of has reached a similar holding"); United States v. Rafael G Pena, 910 F. Supp. 535, 540 n.1 (D. Kan. 1995) (Belcher "appears to be an anomaly insofar as we are unaware of any other court that has reached a similar decision.").

9

force's weekly strategy sessions"); United States v. Angleton, 314 F.3d 767, 774 (5th Cir. 2002) (joint task force of FBI agents and local police investigating the crime is acceptable).

In addition, the Government contends that the investigation into the Howard Boys did not begin until August 2009, five months after Defendant's plea agreement in state court. Gov't Resp. at 2, 6-7 n.1 (Dkt. 283). And the federal charges against Defendant — asserting that the murder was part of a larger RICO conspiracy — were not brought until May 2012, more than three years after the conclusion of the state court's prosecution. This timeline makes it very unlikely that the Government is merely serving as a tool of the state, acting without its own independent determinations as to the merits and strategy of prosecution. Without some evidence of the state pulling the federal prosecution's strings, or vice versa, Defendant's motion must fail.

Defendant also suggests that the timing and content of a plea agreement in another case involving himself and an unindicted co-conspirator suggests the dual sovereignty doctrine is inappropriate. See Def.'s Br. at 2.[5] However, an agreement between the sovereigns regarding the timing of a prosecution or a possible plea deal is not grounds for dismissal unless there is evidence that one sovereign controlled the prosecution of the other. See, e.g., Mardis, 600 F.3d at 697; see also Zone, 403 F.3d at 1105 ("The Double Jeopardy Clause does not prevent federal

---

[5] In support of this argument, Defendant directed the Court to United States v. Morris, 470 F.3d 596 (6th Cir. 2006). However, the Court finds Morris to be of little assistance in this matter. In Morris, the Government provided misinformation about sentencing, which allegedly influenced the defendant's decision to reject a state court plea agreement. Id. at 598-599. The record also contained significant evidence that the Government was "involved with the state court plea negotiations," "involved in deciding whether a plea offer would be made available to Morris in state court," and involved in including a provision in the agreement that the Government would not prosecute Morris in federal court. Id. at 600. The Sixth Circuit concluded that "[b]ecause the United States Attorney's Office made itself a party to the state court plea offer [through its entanglement with the state court plea process], the district court was justified in enforcing the plea offer against it based on traditional principles of contract law." Id. (emphasis added). In other words, Morris did not concern double jeopardy or the Bartkus exception. Indeed, the Sixth Circuit based its decision to dismiss on the fact that "the state court plea offer included an agreement that Morris would not be prosecuted in federal court, even though the state and federal governments could have chosen to pursue separate prosecutions." Id. at 600.

10

prosecutors from encouraging their state counterparts to pursue plea bargains"); United States v. Aboumoussallem, 726 F.2d 906, 910 n.3 (2d Cir. 1984) ("Even if federal prosecutors had previously agreed that the state prosecution should proceed first in the expectation that substantial punishment would be imposed, the federal prosecutors would not thereby be 'manipulating' a state prosecution in any sense that might implicate double jeopardy or due process concerns") (internal citation omitted)). Defendant has provided no proof of ceding such control; indeed, Defendant offers no evidence whatsoever beyond conjecture and speculation. Zone, 403 F.3d at 1105 ("speculation and conjecture" will not suffice).

Defendant has not provided any evidence, nor sufficiently alleged, that "the federal prosecutor manipulated the state prosecutor []or . . . the reverse." Mardis, 600 F.3d at 697. Nor is there evidence or even a hint that either sovereign "somehow ced[ed] its sovereign authority to prosecute and act[ed] only because the [other sovereign] told it to do so." Djoumessi, 538 F.3d at 550. Rather, Defendant's allegations suggest that the federal, state, and local governments worked together in their investigations. This does not suffice to warrant ignoring the dual sovereignty doctrine.

### IV.  CONCLUSION

For the foregoing reasons, the Court denies Defendant Walker's motion to dismiss (Dkt. 235).

SO ORDERED.


Dated: November 8, 2013          s/Mark A. Goldsmith
       Flint, Michigan           MARK A. GOLDSMITH
                                 United States District Judge

## **CERTIFICATE OF SERVICE**

  The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 8, 2013.

                s/Deborah J. Goltz
                DEBORAH J. GOLTZ
                Case Manager